# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**JOSE ARAIZA-CALZADA et al.,**

      **Plaintiffs,**

**v.**                                   **CASE NO. 5:13-cv-15-RS-CJK**

**WEBB'S SEAFOOD, INC.,**

      **Defendant.**

_____/

## ORDER

Before me are Plaintiff's Motion for Summary Judgment (Doc. 118) and Defendant's Motion for Summary Judgment (Doc. 121).

## I. BACKGROUND

The issue before me is a matter of first impression. I must decide whether oyster shuckers fall under the definition of "agricultural employment" under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 et seq. ("AWPA").

Defendant Webb's Seafood ("Webb's") operates an oyster packing and processing facility in Youngstown, Florida. Plaintiffs ("Plaintiffs") are Mexican guestworkers who came to work for Webb's as oyster shuckers under the H-2B Visa program. The Plaintiffs brought suit against Webb alleging violations of the Fair Labor Standards Act (FLSA), the Florida Constitution, the AWPA, as well as

breach of contract. All of the monetary claims have settled, and the only claim remaining is a request for declaratory judgment that oyster shuckers are entitled to AWPA protections.

## II. FACTS

The facts are undisputed. The parties, in a 32-page Stipulated Joint Statement of Facts (Doc. 112) and a 27 page Expert Report (Doc. 115), have thoroughly described the operations of Webb's Seafood and the oyster shucking process. I summarize the pertinent facts below.

### a. *Webb's Seafood*

Webb's Seafood is a small business in Youngstown, Florida, that processes oysters purchased from other sources. It resells processed oysters to customers such as restaurants, grocery stores, and wholesalers. The oysters come from the Gulf of Mexico in Florida, Louisiana, and Texas. Webb's purchases Florida oysters direct from harvesters and purchases the Texas and Louisiana oysters from wholesale seafood companies. All oysters that Webb's processes are naturally bred and wild caught and are not considered aquaculture products.

After experiencing a labor shortage, Webb's explored the possibility of hiring guest workers through the federal H2-B program. The Department of Labor approved Webb's application for the program and approved Webb's plan to hire 28 workers at $9.20 per hour as oyster shuckers. Webb's recruited the ten Plaintiff-

employees directly through a longtime employee, Juan Calzada. The Plaintiffs were approved for non-agricultural work visas and came to the United States from Mexico. They worked for several months in the spring and summer of 2011. After returning to Mexico, they all reapplied for a second certification period and returned to Webb's in fall 2011.

In the fall of 2011, red tide dramatically reduced the supply of oysters in Texas. Webb's was unable to provide full time hours to its shuckers, and terminated some of its H2-B workers, who were at-will employees. Eight of the ten original plaintiffs were among those terminated.

### b.  Oysters

The eastern oyster, *Crassostrea virginica*, occurs naturally and is found in coastal estuaries through the U.S. Gulf of Mexico. Oysters naturally colonize, grow, and form substantial topographical features called reefs. Reefs can sustain biodiverse ecosystems, which in turn lead to increased oyster production, which in turn supports an active oyster fishery.

Oysters grow on these reefs where there are proper climate and water conditions and available nutrition. Young oysters—spat—need to set on substrate, which includes sediment, hard bottom, structures underlying the waters, and associated biological communities. Once oysters have set, they can grow to 1 inch within as little as six weeks and generally reach harvest size (3 inches) in about 18-

24 months. Oysters between 1-3 inches are known as "seed" oysters. Harvest size oysters are known as "sack" oysters. Oyster reefs include spat, seed, and sack oysters, as well as "culch"—hard material such as shells or rocks placed on the water bottom to create or enhance a hard surface.

When harvesting, harvesters keep only the sack oysters and return the remaining spat, seed, and cultch to the reef. Because harvesting can damage substrate, periodic and managed "clutching" is required to support sustainable reefs. Cultching involves actively adding cultch to existing oyster reefs. The extent to which maintenance and clutching is required varies by region and state.

Oysters in Florida are harvested through hand-tonging, by which fishermen use tongs to harvest oysters from reefs and then separate out sack oysters on board. Mechanical dredging is more commonly used to harvest oysters in Louisiana and Texas; oysters are likewise brought on board and separated after being dredged.

Oyster harvesting and production are regulated at the state level, but must comply with guidelines published by the Food and Drug Administration's National Shellfish Sanitation Program. Oyster temperature conditions are closely monitored throughout the process in order to reduce the risk of disease. Shortly after harvesting, oysters must be refrigerated.

When Webb's purchases Texas and Louisiana oysters, they arrive refrigerated. When it purchases Florida oysters, the oysters have already been

culled, washed, graded, bagged, and tagged. Webb's maintains a separate facility in Eastpoint, Florida to receive oysters, refrigerate them, and transport them to its Youngstown facility for processing.

### c.  Processing and Shucking

Oysters are refrigerated at Webb's until they are ready to processed, although sometimes the processing happens immediately. Oysters are either processed as fully shucked oysters (essentially lumps of oyster meat) or as frozen half shell oysters (oysters with their top shell removed).

First, oysters are moved on conveyer belt and sprayed with water and sent in a single layer to a hot water tank.

Second, the oysters go through a "heat-shock" process. Heat shocking is a process in which oysters are subject to controlled, temporary exposure to hot water in order to weaken their muscles and make them easier for shuckers to open. The process must be highly controlled in order to avoid cooking or killing the oysters. The process is designed not to alter any physical or organoleptic characteristics of the shellfish.

During the heat-shock process, oysters are placed in hot water (around 145-152 degrees Fahrenheit) for short periods (less than 5 minutes). The exact times and temperatures vary according to oyster size and grade.

Third, after some time, the oysters pass in a single layer on another conveyor belt where they begin cooling and are delivered to the shucking table.

Fourth, in the Shucking Room, oyster shuckers (such as the Plaintiffs) manually open the oyster shells using a knife, extract the meat from the oyster, and place the meat into buckets full of ice slush. For frozen half-shell oysters, the shuckers remove only the tops hell and place the half-shell on a different conveyor belt.

Fifth, the oysters are weighed, inspected, and packed into cold storage.

Sixth, the finished product is distributed in refrigerated trucks.

## III. PROCEDURE

This case was originally filed in January 2013 by seven former Webb's employees who had entered the United States from Mexico as part of the H2-B program. Three additional workers later joined as plaintiffs. The Plaintiffs alleged in their Amended Complaint that Webb's had committed violations of the Fair Labor Standards Act, the minimum wage provisions of the Florida Constitution, the AWPA, as well as a common law contract violation. Three of the plaintiffs have settled all of their claims entirely, and the remaining seven plaintiffs have settled their claims, but their settlement agreement is contingent in part upon a declaration that they are entitled to the protections of the AWPA. This case is procedurally similar to *Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163,

1166 (11th Cir. 2003), where "[a]s a condition of the settlement agreement. . . the district court retained jurisdiction to resolve the remaining issue of whether the AWPA applies."

In other words, the only issue before me is whether the AWPA applies to oyster shuckers.

## IV. ANALYSIS

### *a. Standard of Review*

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

The facts of this case are not disputed. Rather, I am asked to apply the undisputed facts to determine, as a matter of law, whether the Plaintiff oyster

shuckers are "agricultural workers" under the Migrant and Seasonal Agricultural

Worker Protection Act.

### b.  *The Parties' Contentions*

Plaintiffs contend that they are entitled to the protections of the AWPA.

They argue that they fall under the Act's definition of agricultural employment, 29

U.S.C. § 1802(3):

> The term "agricultural employment" means employment in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f)), or section 3121(g) of Title 26 and the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.

Plaintiffs have the burden of establishing that they are covered by the Act.

*See, e.g, Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1298

(11th Cir. 2011) (finding that in order to be eligible for an analogous FLSA claim,

"an employee must first demonstrate that he is 'covered' by the FLSA.").

Webb's contends that Plaintiffs are not entitled to AWPA protections. It

makes five arguments that they are not. The first three are arguments that oyster

shucking does not fall under the definition of "agricultural employment" in 29

U.S.C. § 1802(3). First, it argues that Congress did not intend oyster shucking to be

included in the definition of "agricultural employment" and did not intend for

oysters to be considered "agricultural or horticultural commodities." Second, it

argues that the oysters have already been "deliver[ed] for storage" by the time they

are shucked. Third, it argues that the oysters are not in an "unmanufactured state" at the time they are shucked.

Fourth, Webb's argues that each Plaintiff does not qualify as a "migrant agricultural worker," defined as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence," 29 U.S.C. 1802(8)(A), because the employment was not of a "seasonal or other temporary nature."

Fifth, Webb's argues that the AWPA would be unconstitutionally vague if applied to oyster shuckers.

### c. *Whether Oysters are "Agricultural or Horticultural Commodities"*

The AWPA contains three definitions of "agricultural employment"—the definition provided in FLSA, the definition provided in the Internal Revenue Code, and the broader definition included in the text of 29 U.S.C. 1802(3). Plaintiffs concede that the first two definitions have been construed to mean traditional agricultural work performed "on a farm." *See Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163, 1167 (11th Cir. 2003). However, they argue that oysters are an "agricultural commodity" and therefore fall under the broader AWPA definition.

It is ambiguous whether oysters should be considered an "agricultural or horticultural commodity." The term is not defined, and there appears to be little on-point regulatory guidance or judicial interpretation.

Upon thorough consideration of the text, the history of the AWPA, and available guidance, I find that Congress did not intend for oyster workers and other seafood workers to fall under the AWPA, and that oysters are not "agricultural or horticultural commodities" under the Act.

Congress passed the Migrant and Seasonal Agricultural Worker Protection Act in 1983 to replace the Farm Labor Contractor Registration Act of 1963, 7 U.S.C. § 2041 et seq. ("FLCRA") (repealed 1983), which was ineffective at accomplishing its purposes. *See Monte-Navarro*, 350 F.3d at 1169. In passing the AWPA, Congress intended to expand the definition of "agricultural employment" to include activities not previously covered by the FLCRA. *Id.*

Congress undoubtedly intended the AWPA to extend migrant worker protections beyond what was included in any previous definitions of agriculture. However, it did not intend to extend the law to every worker under the sun. This case is unique in AWPA jurisprudence because no court appears to have considered whether the AWPA extends beyond the land itself to the sea. It seems, without explicit guidance to the contrary, that Congress did not intend the Act to extend so far.

*1. The legislative history of the AWPA shows that Congress did not intend*

*seafood to be included in "agriculture."*

The FLCRA, the AWPA's predecessor, had its roots in the 1938 Fair Labor

Standards Act, 29 U.S.C. § 201 et seq. The FLSA's definition of agriculture, which

is basically unchanged from 1938, includes

> "farming in all its branches and among other things includes the cultivation
> and tillage of the soil, dairying, the production, cultivation, growing, and
> harvesting of any agricultural or horticultural commodities (including
> commodities defined as agricultural commodities in section 1141j(g) of Title
> 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any
> practices (including any forestry or lumbering operations) performed by a
> farmer or on a farm as an incident to or in conjunction with such farming
> operations, including preparation for market, delivery to storage or to market
> or to carriers for transportation to market."

29 U.S.C. § 203(f). This definition, as Plaintiffs concede, does not include

seafood because its provisions appear to apply to land-based agriculture.

The other definition of agriculture which the FLCRA adopted was the

Internal Revenue Code definition, which is even less ambiguous in its exclusion of

seafood. That definition ties "agriculture" to work that occurs on a "farm," which

includes "stock, dairy, poultry, fruit, fur-bearing animal, and truck farms,

plantations, ranches, nurseries, ranges, greenhouses or other similar structures used

primarily for the raising of agricultural or horticultural commodities, and

orchards." 26 U.S.C. § 3121(g).

Congress treated seafood separately from agriculture in a number of respects. In carving out wage and hour exemptions to the FLSA, Congress carved out separate exemptions for those "employed in agriculture", 29 U.S.C. § 213(a)(6), with those "employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life," 29 U.S.C. § 213(a)(5). The juxtaposition of those "employed in agriculture" with those "employed in the catching . . . of fish" shows that Congress thought that "agriculture" did not include seafood. Otherwise, there would be no reason for the separate provision.

Likewise, the revenue code maintains separate distinctions for seafood. 26 U.S.C. 3121(b)(20) exempts service performed by "an individual on a boat engaged in catching fish or other forms of aquatic animal life," without referencing the definition of "agricultural labor" in 26 U.S.C. 3121(g). Furthermore, *compare* 26 U.S.C. § 3306(c)(17) (exempting "farming of any kind of fish [or] shellfish") *with* 26 U.S.C.3306(k) (adopting "agricultural labor" definition from 3121(g)).

It therefore seems clear that in 1938, Congress intended "agriculture" to be limited to the land. What is fatal to Plaintiffs' contention is there appears to be no evidence that Congress has changed its mind.

When Congress passed the FLCRA of 1963, it included by incorporation these definitions of agriculture. *See* Pub. L. 88-582, 78 Stat. 920 (Sept. 7, 1964).

Congress had previously operated under the assumption that "agriculture" did not mean seafood, and there is no indication that the FLCRA intended to change that. Likewise, when Congress amended the FLCRA in 1974 to broaden the scope of coverage and added the third definition that makes up the modern AWPA, *see* Pub. L. 93-518, 88 Stat 1652 (Dec. 7, 1974), it gave no indication whatsoever that it intended to expand the definition of agriculture so far as to include seafood.

Instead, evidence at the time suggests that Congress still believed agriculture and seafood work to be distinctly different activities. The Summary of the Fair Labor Standards Amendments of 1974, put out by the Committee on Education and Labor on April 2, 1974, just a few months before the Amendments to the FLCRA, indicates that "Agricultural Employees," which were described in Section 4 of the report, were treated differently than "Seafood Canning and Processing" employees in Section 11. (*See* Doc. 123-5). When Congress amended the FLCRA just a few months later, it added a definition to include the "processing . . . of any agricultural or horticultural commodity." 7 U.S.C. § 2043(d), v1 Titles 1-7 at 1409 (1976). It would be difficult to believe that Congress intended seafood to be treated as an "agricultural commodity" in the context of FLCRA when it very recently had put out separate provisions to apply to seafood processors.

Likewise, the legislative record surrounding the 1974 amendments does not appear to contain any indication that Congress intended to expand "agriculture" to

include seafood. *See, e.g.,* Joint Conf. Rep. 93-953, *reprinted in* 1974 USCCAN

2862; S. Conf. Rep., Fair Labor Standards Amendments of 1974, S. Rep. No. 93-

760 (March 28, 1974) (no mention of seafood employees)*;* H. Rep. No. 93-913,

*reprinted in* 1974 USCCAN 2811, Fair Labor Standards Amendments of 1974

(March 15, 1974); ("Overtime coverage is extended to seasonal industry and

agricultural processing employees . . . [and] seafood canning and processing

employees . . .."); S. Rep. No. 93-1295, H. Rep. No. 93-1493, *reprinted in* 1974

USCCAN 6441, Farm Labor Contractor Registration Act Amendments of 1974

(Nov. 21, 1974) (no mention of seafood employees). Nor does there appear to be

any indication that Congress intended the 1983 AWPA to expand coverage to

seafood workers. *See, e.g.*, H. Rep. No. 97-885, *reprinted in* 1982 USCCAN 4547,

Migrant and Seasonal Agricultural Worker Protection Act (Sept. 28, 1982) (no

mention of seafood employees).

Plaintiffs' argument that the FLSA and revenue code definitions should be

narrowly construed as exemptions rather than grants of coverage misses the mark.

The definitions provided in the exemptions, rather, are useful in understanding, in

the absence of any direct evidence, whether Congress intended "agriculture" to

encompass seafood and other fruits of the ocean. The conscious decision to

separately define seafood from "agriculture" even when it had ample opportunity

to include it within varyingly broad definitions of agriculture is powerful evidence

that Congress did not consider seafood to be a part of what it considered

"agriculture," but rather that seafood was something entirely different.

Furthermore, the plain language of the AWPA shows connection between

the FLSA and IRS exemption definitions and the third AWPA definition. 29 U.S.C

1802(3) provides coverage to anyone who falls under the FLSA definition, *or*

under the IRS definition, *and* under the third definition. The deliberate choice to

connect the third definition with the conjunctive "and" rather than the disjunctive

"or" demonstrates some connection between the third definition, including its

reference "agricultural and horticultural products," and the definitions in the

exemptions of the FLSA and revenue code. Otherwise, "or" would have been a

more appropriate word choice. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99

S. Ct. 2326, 2331, 60 L. Ed. 2d 931 (1979) ("Canons of construction ordinarily

suggest that terms connected by a disjunctive be given separate meanings.").

The 1974 Amendments to the FLCRA and the AWPA admittedly purported

to extend the reach of the original FLCRA. This was apparent from Congress's

choice to add an additional definition of "agricultural employees." Indeed,

"Congress intended to expand the definition of 'agriculture' and 'agricultural

employment' to include activities, regardless of their location, not previously

covered by the FLCRA." *Morante-Navarro*, 350 F.3d at 1169. However, there is

no indication that Congress intended to expand the definition of agriculture to

reach to the sea. Congress had considered seafood to be a separately regulated category of workers since it first began regulating labor, and it gave no indication whatsoever that it intended to expand "agriculture" so far as to include workers that never before been considered even within the realm of plausible "agricultural" employment.

In sum, a thorough review of the history of AWPA indicates that Congress did not intend for the term "agricultural" to apply to seafood.

### 2. *Regulators have historically interpreted "agriculture" not to include seafood.*

Where a statute is ambiguous, courts should afford great deference to executive agency interpretations. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984). The relevant agency, the Department of Labor, does not appear to have defined or interpreted "agriculture" as used in the AWPA to specifically exclude or include seafood. However, its historically disparate treatment of seafood and agriculture provide additional support for my conclusion that "agricultural or horticultural products" do not include seafood.

In interpreting the definition of agriculture in the original FLSA, the predecessor of the definition of agriculture in the modern AWPA, the Department of Labor noted that "the exemption provided by Section 13(a)(5) was intended to

do for the seafood and fishery industry that which was done in other sections of the Act for agriculture." Administrator's opinion, Interpretive Bulletin No. 12 (Dec. 7, 1938), *reprinted in* 1944-1945 Wage and Hour Manual, pp. 500-501 (BNA 1945) (Doc. 123-1). The agency clearly thought that "agriculture" was distinct from the "seafood and fishery industry," as was Congress's intention when it applied certain provisions of the Act to "agriculture."

Indeed, to this day, the DOL continues to interpret "agriculture" as used in the FLSA differently from "seafood." *Compare* 29 C.F.R. § 780 et seq. *with* 29 C.F.R. § 784 et seq. The DOL has recently been emphatic about this distinction. *See, e.g.,* FLSA2004-1, Wage and Hour Division, 2004 WL 769500 (Feb. 5, 2004) ("The activities engaged in by crabmeat pickers and packers do not constitute 'farming,' nor is the work in a seafood processing plant performed 'by a farmer or on a farm.' Therefore, the work of crabmeat pickers and packers does not constitute 'agriculture' under any of the FLSA's definitions."). Nonetheless, the DOL does not maintain any set of distinctions for seafood in the AWPA regulations, nor does it propose to regulate the seafood industry at all. *See* 29 C.F.R. § 500 et seq.

The word "agricultural" as used in the AWPA is a direct legislative descendant of the word's use in the FLSA. The DOL has always interpreted that word in the FLSA context to exclude seafood, and it has never given any indication

that the word in the AWPA should include seafood. The AWPA definition of agriculture is admittedly more expansive than the FLSA definition, but the DOL's failure to define the term indicates that it would not consider agriculture to be so much more expansive that it encroaches into a completely distinct and separately regulated field.

### 3.   Courts have interpreted "agriculture" not to include seafood.

Court decisions provide further support that Congress never intended the word "agriculture" in the AWPA, or the FLCRA or FLSA before it, to apply to seafood.

One court specifically considered whether oyster processing should be included in the agricultural exemption of the FLSA. The answer was a resounding "no." The court reasoned that "having enacted a specific exemption applicable to employees in the fishing industry, it seems unlikely that Congress intended to exempt employees engaged in the same activities under a separate and different provision relating to agricultural workers." *Coast Oyster Co. v. United States*, 167 F. Supp. 460, 461 (W.D. Wash. 1958).

Although the AWPA is admittedly broader than the FLSA definition, the *Coast Oyster* court's reasoning provides additional support for the contention that the FLSA definition of agriculture—the precursor to the AWPA definition—was never meant to include seafood. Its reasoning is also pertinent to the AWPA. Since

seafood workers are separately regulated and excluded from other uses of the word "agriculture," it seems highly unlikely that Congress would have meant to include them in the AWPA definition of "agriculture" without explicitly saying so.

      *4.*  *AWPA jurisprudence has not extended the definition of "agriculture" to apply to seafood.*

Lastly, I find nothing in modern AWPA jurisprudence that would extend the Act's coverage to oyster shuckers.

Plaintiffs contend that the Eleventh Circuit established a three-part test for whether a product is an "agricultural or horticultural commodity" under the AWPA. In *Monrante-Navarro*, the court determined that pine straw was an agricultural commodity because it could be "produced by a natural process that can be . . . enhanced by manual labor and cannot be put to commercial use without human intervention." *Morante-Navarro*, 350 F.3d at 1172. According to Plaintiffs, the test for "whether a commodity is 'agricultural' for the purposes of the AWPA" is whether it (1) is produced by a natural process, (2) can be enhanced by manual labor, and (3) cannot be put to commercial use without human intervention. (*See* Doc. 118 at 3.)

However, *Morante-Navarro* did not purport to establish a test or extend the definition of agricultural products so far. Rather, the court was merely summarizing its reasoning in determining that pine straw is an agricultural

commodity. The court never framed its analysis to create a test, and even to the extent that it can be construed as a test, it must be limited as within the realm of what Congress has always considered to be "agriculture"—that is, farming, cultivating, and other similar endeavors that occur on land. Congress has always considered the sea and its fruits to be distinct and separately regulated apart from anything labeled "agriculture," and any test purporting to define agriculture can only be as broad as the outer limits of Congress's plausible intentions.

Rather, jurisprudence assessing whether products fall under the AWPA's third definition of agriculture have all involved land-based, rather than sea-based, products. *See, e.g., Morante-Navarro*, 350 F.3d at 1172 (pine straw); *Bresgal v. Brock*, 843 F.2d 1163, 1167 (9th Cir. 1988) (trees raised for crop); *Bracamontes*, 840 F.2d at 276 (5th Cir. 1988) (pine seedlings).

I cannot accept Plaintiffs' arguments that this court should construe the AWPA more broadly in order to effect the remedial and humanitarian purposes of the Act. Although the Act was undoubtedly intended to expand the definition of agriculture for humanitarian reasons, and I do not doubt the difficulties that Plaintiffs have faced as a result of their experience as migrant workers, it is not the place of this court to extend the definition into the seas when Congress appears to have understood seafood to be something entirely different from "agriculture." It

must be left to Congress, not the courts, to enact such a significant and unexpected expansion of this country's labor laws.

## V. CONCLUSION

For these reasons, I find that oysters are not an "agricultural or horticultural product" within the AWPA's definition of agricultural employment, 29 U.S.C. § 1802(3), and that oyster shuckers do not fall within the protections of the AWPA. Because they fall outside the definition, I need not address the parties' other contentions as to whether the Act applies to oyster shuckers.

Plaintiff's Motion for Summary Judgment (Doc. 118) is **DENIED**. The relief requested in Defendants' Motion for Summary Judgment (Doc. 121) is **GRANTED.** Plaintiff's remaining claims are **DISMISSED WITH PREJUDICE.** The Clerk is directed to close the case.

**ORDERED** on September 10, 2014.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**